Opinion issued August 22, 2002

 


















In The

Court of Appeals

For The

First District of Texas






NO. 01-00-00628-CR






DROR HAIM GOLDBERG, Appellant


V.


THE STATE OF TEXAS, Appellee





On Appeal from the 248th District Court

Harris County, Texas

Trial Court Cause No. 805617





O P I N I O N


 A jury convicted appellant, Dror Haim Goldberg, of murder and assessed
punishment at 45 years confinement and a $10,000 fine. We affirm. In 51 points of
error, appellant contends the trial court erred by: (1) denying his motion to suppress
evidence because he was illegally arrested; (2) admitting evidence that was both
irrelevant and unduly prejudicial; (3) admitting evidence obtained as a result of a
school search that took place three years before the offense; (4) admitting irrelevant
letters that appellant wrote to a friend two years before the offense; (5) permitting
witnesses to identify appellant at trial after they had viewed impermissibly suggestive
line-ups; (6) admitting statements that appellant made to German police officers when
he was taken into custody; (7) allowing the State to use its peremptory strikes to
exclude women from the jury; (8) violating the rule of "optional completeness" by not
allowing appellant to introduce the entire statement he made to police after the State
introduced other portions of the same conversation; and (9) permitting the State to
comment on appellant's decision not to testify. We affirm.

BACKGROUND (1)

 In the late morning or early afternoon of November 27, 1998, a young, white
male entered a wig shop at the Weslayan Plaza Shopping Center in Houston, Texas. 
He walked in, looked around, and left without talking to either Manuela Silverio or
Roberta Ingrando, both of whom were working there that day.

 At just before 4 p.m. the same day, the same man returned to the wig shop. 
Mrs. Ingrando saw the man walk up to Ms. Silverio and "punch" her in the neck, so
Mrs. Ingrando ran to call the police. The man cut Mrs. Ingrando's wrist, knocking
the phone from her hands. He then stabbed her several times, asking her, "Do you
like it?" He also told her that he was going to cut her nose and ears and make her
pretty. Mrs. Ingrando's husband, Roland, who was working in the back of the store,
ran to the front when he heard his wife screaming. Mr. Ingrando threw a tray of hair
rollers at the assailant, and then wrestled with the assailant briefly, sustaining several
cuts during the struggle. The assailant fled the store.

 At the same time, Dr. Randall Beckman was leaving a pet store across the
parking lot after purchasing dog food. Dr. Beckman saw the assailant running across
the parking lot. Thinking that someone might need assistance, Dr. Beckman got into
his car and followed the man across the parking lot. Dr. Beckman saw the man get
into a dark Lincoln Navigator and back out of a parking space. Dr. Beckman then
passed the Navigator in the parking lot and was able to clearly see the driver, as the
two vehicles passed driver's side window to driver's side window. After passing the
Navigator, Dr. Beckman turned around and wrote down the license plate of the
Navigator.

 Dr. Beckman then parked in front of the wig shop and went inside to see if
anyone needed his help. He found Manuela Silverio lying in a pool of blood on the
floor and Mr. and Mrs. Ingrando hysterically trying to telephone the police. Dr.
Beckman tried to revive Silverio, but she was dead. Mr. and Mrs. Ingrando were
taken to the hospital. Mr. Ingrando's injuries were minor, and he was soon released. 
However, Mrs. Ingrando required surgery and was hospitalized for at least a week.

 Dr. Beckman was interviewed at the scene of the crime, and he gave the police
the paper upon which he had written the license plate number of the Navigator. He
also described the assailant as a white male, approximately six feet tall, 18-19 years
old, 165 pounds, with short-to-medium sandy blonde hair. 

 The police ran the license plate number provided by Dr. Beckman and
discovered that it was registered to Loren Nelson, who lived nearby at 2202 Dunstan. 
Loren Nelson, now Loren Goldberg, lived with appellant's father at that address. 
Several officers drove to the 2202 Dunstan address and located the Navigator in a
covered parking area behind the house. One of the officers touched the hood of the
Navigator and it was still warm, but no one was at home at the residence except the
housekeeper, Marleny Vilorio. Ms. Vilorio told the officers that Dr. Goldberg and
Loren Nelson were out of town and that appellant, Dror Goldberg, had been left in
charge of the house. The keys to the Navigator were in the house.

 At 6:07 p.m., appellant drove up to 2202 Dunstan in his white pick-up truck. 
Officer M.L. Sampson approached appellant and asked if he were Dror Goldberg. 
Appellant said that he was, and Officer Sampson handcuffed him, performed a pat-down search, and informed appellant of his rights. Appellant indicated that he
understood his rights and indicated that he would be willing to talk with the officer.

 Appellant was later uncuffed, and he talked with the police about his
whereabouts that day. He also executed consent forms for the police to search: (1) 
his father's residence at 2202 Dunstan, (2) appellant's own white pick-up truck; and
(3) appellant's apartment at 4301 Bissonnet. While at 2202 Dunstan, police noticed
blood on appellant's shirt and a red mark on his chest. They also seized the Navigator
and had it towed to the police station, where it was later searched pursuant to a
warrant. (2) Before searching 2202 Dunstan, the police took a Polaroid photo of
appellant. 

 At 8:07 p.m., the police completed their search at 2202 Dunstan and
transported appellant to the police station. During the ride to the police station,
appellant told the police officer that the Navigator had been stolen in the past, but that
every time it was stolen, the thief always just returned it. At the police station,
appellant gave police his finger and palm prints. He also executed a waiver of the
presence of an attorney and participated in a videotaped line-up. At approximately
11:00 p.m., appellant was released and went home with his mother.

 Meanwhile, at 8:30 p.m., Dr. Beckman looked at a photo array containing the
Polaroid taken of appellant and indicated he was 80% certain that appellant was the
man he had seen running from the wig shop. Dr. Beckman and Mrs. Ingrando were
later shown the videotaped line-up and both identified appellant as the assailant.

 Appellant was indicted on February 17, 1999, but efforts to arrest him were
fruitless because he had left the country. A federal warrant was issued for his arrest,
and he was arrested at the Frankfurt Airport in Germany on June 21, 1999.

A. Motion to Suppress Evidence Obtained as a Result of November 27, 1998
Searches 


 In points of error one through nine, appellant contends that he was arrested at
6:07 p.m., the moment he approached the house at 2202 Dunstan and was handcuffed. 
He argues that, because there was no probable cause to arrest him at that time, the
trial court should have suppressed all evidence seized at 2202 Dunstan, from
appellant's pick-up truck, and from appellant's apartment. (3) Appellant also contends
that the photo and video line-ups should be suppressed because they, too, were fruits
of his illegal arrest.

 1. Standard of Review

 When a motion to suppress is presented, the trial court is the sole judge of the
witnesses' credibility and the weight to be given their testimony. Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The appellate court's only role is to
decide whether the trial court improperly applied the law to the facts. Williams v.
State, 937 S.W.2d 23, 26 (Tex. App.--Houston [1st Dist.] 1996, pet. ref'd, untimely
filed). Unless the trial court clearly abused its discretion, we will not disturb its
findings. Rivera v. State, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991); Williams, 937
S.W.2d at 26.

 Further, the appellate court affords nearly complete deference to the trial
court's rulings on "mixed questions of law and fact," such as probable cause and
reasonable suspicion, where the resolution of those questions turns on an evaluation
of credibility and demeanor. Guzman, 955 S.W.2d at 89. Accordingly, the appellate
court reviews the evidence in the light most favorable to the ruling of the trial court. 
Id.; Taylor v. State, 945 S.W.2d 295, 297 (Tex. App.--Houston [1st Dist.] 1997, pet.
ref'd) (applying standard and reversing trial court).

 2. Facts Relating to the Seizure (4) of Appellant

 At approximately 4:24 p.m. on the day of the murder, officers on the scene at
the wig shop determined that the Navigator seen by Dr. Beckman was registered to
Loren Nelson, who lived at 2202 Dunstan. Several of the uniformed officers left the
wig shop and drove to the Dunstan address, where they found the Navigator parked
in an open carport behind the house. The carport opened on to a public alley behind
the residence and the license plate was clearly visible from Shepard Street. One of
the officers walked up to the Navigator, felt it, and determined that the hood was still
warm. Homicide detective Mike Sampson was dispatched to the Dunstan address and
arrived at 5:45 p.m. His purpose in going there was to seize the Navigator and
question the maid.

 Sampson talked to the maid, Marleny Vilorio, and she told him that Loren
Nelson and Dr. Goldberg were on vacation, but that their son, Dror, had been left in
charge. As the officer was talking with Vilorio, appellant drove up to the residence
in his white pick-up truck, got out, and approached the officers. He was wearing a
white t-shirt and grey shorts. Vilorio indicated that appellant was the son to whom
she had referred.

 Sampson asked appellant if he was "Dror Goldberg," and appellant answered
affirmatively. Sampson then handcuffed appellant and read him his rights. Sampson
explained that a witness to a murder had seen the assailant flee in the Navigator and
that he was there to seize the Navigator. Appellant was initially very nervous-almost
hyperventilating-but he soon calmed down.

 Sampson asked appellant if he had driven the Navigator that day. Appellant
answered that he had not, but stated that he had driven his father and Ms. Nelson to
the airport in the Navigator the day before. Sampson had appellant feel the hood of
the car, and appellant agreed that it had been driven recently. He also gave Sampson
a detailed description of his activities of the day. Sampson asked appellant if he
would consent to a search of 2202 Dunstan, and appellant agreed.

 Sampson unhandcuffed appellant, escorted him back to the police car, and had
him sit in the back. He told appellant that he had the right to refuse consent and the
right to read the "consent to search" form before signing it. Appellant read the form
and signed it. It was witnessed by two other officers at the scene. Although there
were several officers present, and all were armed, no weapons were drawn and no one
threatened appellant in any way. While still outside with appellant, Sampson noticed
a red mark near the center of appellant's chest, near the collarbone. Appellant
explained that he must have gotten the injury playing football.

 Sampson then escorted appellant into the house. He had appellant wait in the
dining room while the house was searched. At some point, appellant indicated that
he needed to use the restroom. Sampson escorted appellant to the restroom, and, on
the way back to the dining room, Sampson noticed what he believed to be a
bloodstain on the back of appellant's shirt. He took the shirt as evidence and had
appellant put on another shirt. Sampson also took a Polaroid photograph of appellant
while they were in the house. No other evidence was found in the house.

 At approximately 7:30 p.m., after searching the Dunstan house, Sampson also
asked appellant if he would consent to a search of his apartment at 4301 Bissonnet
and his white pick-up truck. Again, Sampson informed appellant that he had the right
to refuse consent, and, again, appellant agreed to the search and signed the "consent-to-search forms." Two knives were recovered from appellant's pick-up truck-one an
illegal double-edged knife, the other a Swiss army knife. When police searched
appellant's apartment, they recovered a pair of dark warm-up pants, with boxer shorts
still inside them, and a dark thermal long-sleeved shirt from the floor of appellant's
closet.

 Sampson secured the Dunstan house at approximately 8:00 p.m., and appellant
was taken to the police station at 1200 Travis Street, where he agreed to provide the
police with a set of "elimination" finger and palm prints. Appellant was questioned
at 1200 Travis by Officer Brian Harris, during which time he agreed to participate in
a videotaped line-up. However, to conduct the line-up they had to travel to the old
police headquarters at 61 Reisner Street. The fingerprints that appellant had agreed
to provide were also to be taken at 61 Reisner. During the drive to 61 Reisner,
appellant was not handcuffed and sat in the front seat next to Harris. During the
drive, appellant asked whether it would matter that the Navigator had been stolen
before. He went on to say that the Navigator had been stolen on several prior
occasions, but that it was always simply just returned to the Dunstan address. He
theorized that someone must have a duplicate set of keys.

 After arriving at 61 Riesner, appellant was given a document entitled "Waiver
of Right to Have an Attorney Present at a Show Up." The document informed
appellant that the purpose of the line-up was to see if witnesses could identify him as
a person who has committed a crime. It also informed appellant that he had the right
to have an attorney present at the line-up, or to have one appointed if he could not
afford one. Finally, the document stated that appellant made the waiver of his own
free will. Appellant signed the document, and then participated in a videotaped line-up. At approximately 11:00 p.m., appellant was released and went home with his
mother.

 Meanwhile, at approximately 8:30 p.m., Dr. Beckman was shown a photo array
containing the Polaroid photograph of appellant, which was taken at the Dunstan
residence. Dr. Beckman was 80% certain the man he chose from the photo array,
appellant, was the same man he had seen fleeing the wig shop. Both Dr. Beckman
and Mrs. Ingrando were later shown the videotaped line-up, and both identified
appellant from the line-up as the perpetrator.

 3. Detention or Arrest at 2202 Dunstan? 

 Appellant contends that he was arrested at 6:07 p.m., when he approached 2202
Dunstan and was handcuffed. The State argues that this was nothing more than an
investigative detention.

 Whether a detention is an investigative detention or an arrest depends upon the
facts and circumstances surrounding the detention. Amores v. State, 816 S.W.2d 407,
412 (Tex. Crim. App. 1991); Hoag v. State, 728 S.W.2d 375, 378-79 (Tex. Crim.
App. 1987); Hilla v. State, 832 S.W.2d 773, 778 (Tex. App.--Houston [1st Dist.]
1992, pet. ref'd). The reasonable use of handcuffs or the ordering of a suspect to lie
down alone does not convert an investigative detention into an arrest. Handcuffing
alone will not necessarily convert a temporary detention into an arrest. See Rhodes
v. State, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997); Burkes v. State, 830 S.W.2d
922, 924 (Tex. Crim. App. 1991); Hilla, 832 S.W.2d at 778. Whether an officer
believes a suspect is detained or arrested, is not determinative of the issue. Amores,
816 S.W.2d at 412; Hoag, 728 S.W.2d at 378; Hilla, 832 S.W.2d at 778. Rather, we
look to the reasonableness of the officer's actions, which is to be judged from the
perspective of a reasonable officer at the scene, rather than with the advantage of
hindsight. Rhodes, 945 S.W.2d at 118. "Furthermore, allowances must be made for
the fact that officers must often make quick decisions under tense, uncertain and
rapidly changing circumstances." Id. Police may use such force as is reasonably
necessary to effect the goal of the detention: investigation, maintenance of the status
quo, or officer safety. Id. at 117. An investigative detention implies that the obtrusive
act is for the purpose of actually investigating. Burkes, 830 S.W.2d at 925. Thus,
where no investigation is undertaken, the detention cannot be considered
investigatory and rises to the level of an arrest. Id.

 When Sampson was dispatched to 2202 Dunstan, his assignment was to seize
the Navigator and to begin an investigation by questioning the maid. As such, he was
clearly conducting an investigation when he was approached by appellant. It was
reasonable, in light of the fact that a brutal murder had just occurred, for Sampson to
handcuff appellant for the officer's own safety while attempting to ascertain whether
appellant had, in fact, been driving the Navigator that day. After appellant was
identified as the person who had been in charge of the Navigator, it was reasonable
for Sampson to continue to detain him while he, Sampson, completed his
investigation of the scene. Although Sampson read appellant his rights, appellant was
never told that he was under arrest. Rather, Sampson told appellant that he was
investigating how the Navigator came to be seen leaving the scene of a murder. 
Sampson then continued his investigation by questioning appellant about whether he
had driven the Navigator that day. 

 Therefore, we conclude that the initial handcuffing of appellant was not an
arrest, but a temporary detention, and was justified by concerns for the officer's
safety. The appellant's continued detention was justified by Sampson's need to
continue the investigation he had been dispatched to 2202 Dunstan to perform.

 4. Reasonable Suspicion for Investigatory Detention?

 Having decided that Sampson's initial encounter with appellant at 2202
Dunstan was an investigatory detention, not an arrest, we must next decide whether
it was based upon reasonable suspicion. A police officer may stop and briefly detain
a person for investigative purposes if the officer, in light of his experience, has a
reasonable suspicion supported by articulable facts that criminal activity may be
afoot. Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884-85 (1968). The
reasonableness of a temporary detention must be examined in terms of the totality of
the circumstances. Woods v. State, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). A
temporary detention is justified when the detaining officer has specific, articulable
facts at the time of the detention which, taken together with rational inferences from
those facts, lead him to conclude that the person detained is, has been, or soon will
be engaged in criminal activity. Id. A reasonable suspicion means more than a mere
hunch or suspicion. Davis v. State, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997). 
A detention is not permissible unless the circumstances objectively support a
reasonable suspicion of criminal activity. Id.

 Officer Sampson testified that he detained appellant because: (1) the Navigator
had been seen leaving the scene of the wig shop murder; (2) appellant fit the
description of the person witnesses had seen fleeing the wig shop and getting into the
Navigator; (3) the maid told Sampson that appellant had been staying at 2202
Dunstan and had been left in charge of the Navigator; and (4) the Navigator was still
warm, as if it had been driven recently. Under these circumstances, it was reasonable
for Sampson to suspect that appellant was involved in the wig shop murder and to
temporarily detain him for further investigation.

 5. Voluntary Consent to Search?

 Having decided that the investigatory detention of appellant at 2202 Dunstan
was lawful, we next address the issue of whether he voluntarily consented to the
searches of 2202 Dunstan, his apartment at 4301 Bissonnet, and his pick-up truck. A search pursuant to voluntary consent is an exception to the requirement that
a search be based upon a warrant supported by probable cause. See Reasor v. State,
12 S.W.3d 813, 817 (Tex. Crim. App. 2000). For consent to be valid, however, it
must be voluntary. Id. at 817-18. The fact that a defendant is in custody does
necessarily mean that his consent was involuntary. Id. To determine voluntariness,
trial courts "must [assess] the totality of all the surrounding circumstances-both the
characteristics of the accused and the details of the interrogation." Id. at 818, quoting
Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041 (1973).

 In Reasor, the defendant was arrested at gunpoint and the police illegally swept
his house for weapons. 12 S.W. 3d at 815-17. Nevertheless, the court found that his
subsequent consent to search was voluntary because appellant twice received his
statutory warnings, signed a consent to search form, and was repeatedly warned that
he had the right to remain silent. Id. at 818. The court concluded that the defendant
was aware of his rights, but, nonetheless, voluntarily chose to waive them. Id. at 819.

 In this case, as we have already determined, appellant was lawfully detained. 
No weapons were used to effectuate the detention. Appellant was read his rights,
and, additionally, Officer Sampson told him three times that he had the right to refuse
to consent to any search. Finally, appellant read and signed the consent to search
forms. There is nothing to indicate that appellant's "will was overborne" by
oppressive police conduct. See Jackson v. State, 968 S.W.2d 495, 498 (Tex. App.--
Texarkana 1998, pet. ref'd) (citing Schneckloth,, 412 U.S. at 225-26, 93 S. Ct. 2041). 
Furthermore, it was not unreasonable for the officers' to continue to detain appellant
while they executed the search he had voluntarily given them permission to conduct.

 6. The Line-up Evidence and Evidence Collected at Police Stations

 Although not addressed in a specific point of error, appellant also appears to
complain that the videotaped line-up was also a product of his illegal arrest. The
State points out that even if appellant was arrested at the time he was transported to
the police station, (1) appellant consented to participate in the line-up, and (2) there
was probable cause for appellant's arrest. We agree with the State on both arguments.

 a. Consent

 The evidence shows that appellant was asked whether he would consent to
participating in a videotaped line-up, and he answered affirmatively. To conduct the
line-up, appellant and Officer Harris had to travel from 1200 Travis to 61 Reisner. 
During the ride to the Reisner police station, appellant was not handcuffed and sat in
the front passenger seat of Harris's car. Appellant read and signed a "Waiver of Right
to Have an Attorney Present at a Show Up." In the document, appellant
acknowledged the purpose of the line-up, the fact that he knew could have an attorney
present, but chose to proceed without counsel, and the fact that his decision to do so
was made of his "own free will." Again, there is nothing to indicate that appellant's
"will was overborne" by oppressive police conduct. See Schneckloth, 412 U.S. at
225, 93 S. Ct. at 2047. 

 b. Probable Cause

 Furthermore, even if we were to assume that appellant's detention became an
arrest when he was transported from 2202 Dunstan to 1200 Travis, we would
nonetheless find that the arrest was proper based upon article 14.03(a)(1) of the Texas
Code of Criminal Procedure, which permits a peace officer to arrest a person without
a warrant if the person is found in a suspicious place and under circumstances that
reasonably show that such person has been guilty of some felony or breach of the
peace. See Tex. Code Crim. Proc. Ann. art. 14.03(a)(1) (Vernon Supp. 2002).

 Probable cause exists where the police have reasonably trustworthy information
sufficient to warrant a reasonable person to believe a particular person has committed
or is committing an offense. Guzman v. State, 955 S.W.2d at 87; Amores v. State, 816
S.W.2d 407, 413 (Tex. Crim. App. 1991). Probable cause deals with probabilities;
it requires more than mere suspicion but far less evidence than that needed to support
a conviction or even that needed to support a finding by a preponderance of the
evidence. Guzman, 955 S.W.2d at 87. "The rule of probable cause seeks to
accommodate the sometimes opposing interests of safeguarding citizens from rash
and unreasonable police conduct and giving fair leeway to legitimate law enforcement
efforts." Id. Police broadcasts that are based on probable cause and that report a
felony and a description of the perpetrator satisfy the requirements for a warrantless
arrest. Law v. State, 574 S.W.2d 82, 84 (Tex. Crim. App. 1978).

 Therefore, we must examine the information that Officer Sampson had
gathered by 8:00 p.m.- the time he decided to transport appellant to 1200 Travis for
further questioning.

 Officer Sampson, in his own words, described his probable cause as follows:

 [Defense Counsel]:What justification, what evidence, what
factual discoveries did you make justifying the continuing
custody of Dror Goldberg and asking one of the uniformed
officers to take him down to homicide?


 [Officer Sampson]: As we have stated, he matched the
general description of the person seen running from the
wig shop. The Navigator that was seen at the location that
the person got into was registered to the Dunstan address. 
Dror Goldberg was left in charge of the house. He did
have access to the keys of the Navigator . . .


 He had an injury that I saw on his chest that was consistent
in appearance to what I had been told about some activity
that took place inside the wig shop where the murder took
place. His accounting of his day did not actively or
accurately - let me retract-restate that.


 His accounting of his day did not account for 4:00 p.m. at
the approximate time that the offense was supposed to have
taken place. I used that to base my decision to have him
taken to the Homicide Division to give a statement.


 Although not mentioned by Officer Sampson in this passage of testimony,
Sampson had also discovered that appellant had blood on his shirt. Although the
blood turned out to be appellant's own blood, Sampson could not have known that
at the time. Also not mentioned by Officer Sampson, but present in the record, was
evidence that appellant became extremely nervous-almost hyperventilating-when he
was informed of the reason for the police investigation.

 In light of the facts that: (1) appellant matched the description given by
witnesses at the scene of the crime; (2) the Navigator that was seen fleeing the crime
was left in appellant's care and control, appellant had access to the vehicle, and the
vehicle was still warm; (3) appellant could not offer a clear alibi for the time of the
offense; (4) appellant had a wound to his chest that was consistent with information
that a struggle had occurred at the wig shop; (5) appellant had what appeared to be
blood on his shirt; and (6) appellant almost hyperventilated when he was told the
purpose of the officer's visit, we conclude that Officer Sampson had sufficient cause
to believe that appellant was involved in the wig shop murder.

 c. "Suspicious Place"

 To justify a warrantless arrest under article 14.03(a)(1), the State must prove
not only the existence of probable cause, but also that the defendant was found in a
"suspicious place." Very few places are suspicious per se. Johnson v. State, 722
S.W.2d 417, 421 (Tex. Crim. App. 1986.) A place may become "suspicious,"
however, based on the surrounding circumstances. Id. The facts available to the
arresting officer at the time, and reasonable inferences drawn from those facts, may
render a place suspicious so as to invoke article 14.03(a)(1). Muniz v. State, 851
S.W.2d 238, 251 (Tex. Crim. App.1993); Johnson, 722 S.W.2d at 421. A place can
be suspicious because: (1) an eyewitness or police officer connected the place to the
crime; (2) a crime occurred there or the police reasonably believed a crime occurred
there; (3) specific evidence directly connected the defendant or the place with the
crime; or (4) appellant's behavior was a factor in determining whether a place was
suspicious. See State v. Parson, 988 S.W.2d 264, 268-69 (Tex. App.--San Antonio
1998, no pet.).

 In this case, appellant was found at 2202 Dunstan in his father's yard. 
Although not an inherently suspicious place, the presence of the Navigator at 2202
Dunstan connected the defendant to the crime scene, because an eyewitness saw the
same Navigator at the crime scene and appellant had access to the Navigator. 
Therefore, the presence of the Navigator rendered 2202 Dunstan a suspicious place.

 Even if we agree that appellant's detention became a full blown arrest when he
was transported downtown for further questioning, we conclude it was a valid arrest
pursuant to article 14.03(a)(1) because it was based upon probable cause and
appellant was found in a suspicious place. Therefore, evidence collected at 1200
Travis and 61 Reisner, including the line-ups, were not the fruit of an illegal arrest.

 Accordingly, we overrule points of error one through nine.

 7. Reasonable Expectation of Privacy in Exterior of Navigator?

 In point of error 10, appellant contends the trial court erred by considering the
fact that the hood of the Navigator was warm when touched by police. Specifically,
appellant argues that he had a reasonable expectation of privacy, which the police
violated by approaching the vehicle and touching it.

 We disagree. The record shows that the Navigator was parked in a driveway,
covered by an open carport, behind the residence. The carport consisted of metal
poles supporting a canvas-type awning, which provided shade for vehicles parked
beneath, but did not shield them from public view. 

 The carport was accessed from a public alley that ran behind the house. The
Dunstan address was on the corner of the block, and the Navigator was visible from
both the public alley and the adjoining street. In fact, the Navigator was parked no
more than a few feet from Shepherd Street and the adjacent sidewalk and was also
within a few feet from the public alley. To the left of the Navigator was a hedge of
bushes, which partially separated the carport from the street. However, there was no
privacy fence. The rear entrance of the house was clearly visible through the open
carport.

 a. No Search

 In Cardwell v. Lewis, 417 U.S. 583, 94 S. Ct. 2464 (1973), the defendant was
arrested and his car was seized from a public parking lot and impounded. 417 U.S.
at 588-89, 94 S. Ct. at 2468. At that point, the police had probable cause to believe
the vehicle had been used in a crime. 417 U.S. 587-88, 94 S. Ct. 2467. However, the
next day, without first obtaining a warrant, the police examined the tire treads and
took paint scrapings from the car. 417 U.S. at 589, 94 S. Ct. at 2468. The Supreme
Court, in a plurality opinion, held that the physical examination of the exterior of the
car was not a search. 417 U.S. at 592-93, 94 S. Ct. 2470.

 [N]othing from the interior of the car and no personal effects, which the
Fourth Amendment traditionally has been deemed to protect, were
searched or seized and introduced into evidence. With the "search"
limited to the examination of the tire on the wheel and the taking of
paint scrapings from the exterior of the vehicle left in the public parking
lot, we fail to comprehend what expectation of privacy was infringed. 
Stated simply, the invasion of privacy, "if it can be said to exist, is
abstract and theoretical." Under circumstances such as these, where
probable cause exists, a warrantless examination of the exterior of a car
is not unreasonable under the Fourth and Fourteenth Amendments.


Id. (citations omitted).

 In Hudson v. State, 588 S.W.2d 348, 350-52 (Tex. Crim. App. 1979), the Texas
Court of Criminal Appeals, following Cardwell, also held that the examination of the
exterior of a vehicle was not a search, even if the examination took place on private
property. In Hudson, the defendant was arrested in his home, while his car, which
was parked next to his home, was photographed, both inside and out. The Court of
Criminal Appeals concluded that the photographs of the exterior of the car were
admissible because the defendant had no reasonable expectation of privacy in the
exterior of his car. Id. at 352. Therefore, taking photographs of the exterior of the car
was not a search. Id. at 351, 352. The court found it unimportant that the police were
on private property when the photographs were taken. See id. at 352.

 It is true that the car was taken from a public parking lot in Cardwell,
but that was not the basis of the [Supreme] Court's decision. The
gravamen of the holding was that the owner of the car had no reasonable
expectation that the exterior of his car would not be examined.


Id. (footnote omitted).


 In this case, the police, while standing on a public street or in a public alley,
were able to identify the license plate of the Navigator as the same number that Dr.
Beckman had written down at the murder scene. At that point, they had probable
cause to believe that the Navigator had been used in the crime. Touching the hood
of the vehicle, like the taking the photographs in Hudson or the paint scrapings in
Cardwell, was not a search, but was simply a physical examination of the exterior of
the vehicle. 

 b. probable cause plus exigency

 However, even if we were to conclude that the touching of the Navigator was
a search, it would nonetheless be permissible because the exigency of the situation
made the procurement of a warrant impracticable. To justify a warrantless search, the
State must show the existence of probable cause at the time the search was made, and
the existence of exigent circumstances, which made the procuring of a warrant
impracticable. McNairy v. State, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991); 
Hooper v. State, 516 S.W.2d 941, 943 (Tex. Crim. App. 1974).

 As we stated above, the police had probable cause to search the vehicle once
they determined that the license plate and description of the vehicle matched that
provided by Dr. Beckman at the scene of the crime. See Blount v. State, 965 S.W.2d
53, 55 (Tex. App.--Houston [1st Dist.] 1998, pet. ref'd) (holding that police
broadcast describing alleged crime committed, the color of defendant's car, and
defendant's license plate number established probable cause).

 Obtaining a warrant before touching the vehicle to see if it had been recently
driven would have been impracticable, because, obviously, the heat emanating from
the engine would have dissipated while the officers were waiting for the warrant. 
Therefore, based on the existence of probable cause plus exigency, we conclude that
the officers were justified in touching the vehicle without first obtaining a warrant.

 Furthermore, the intrusion by the police by walking into the open carport and
touching the vehicle was so slight, that the privacy interest appellant seeks to protect
is not one we believe that society would deem reasonable. See Katz v. United States,
389 U.S. 347, 351-53, 88 S. Ct. 507, 511-12 (1967) (holding that fourth amendment
protects people in places where they have a subjective expectation of privacy that is
objectively reasonable). 

 Finally, even if we were to disregard the fact that the hood of the car was warm,
our disposition of the preceding points of error would remain unchanged.

 For these reasons, we overrule point of error 10.

B. Relevancy of Knives and Clothing

 1. The Knives.

 When the police searched appellant's pick-up truck they recovered two knives-
one a Swiss army knife and one a large, double-edged knife. In points of error 11-13,
appellant contends the trial court erred by admitting the knives because they were
either (1) irrelevant, or (2) the probative value of the knives was substantially
outweighed by the risk of undue prejudice. The State argues that the alleged error
was not preserved because appellant did not object every time the State presented
evidence about the knives.

 We believe that the error was preserved because the trial court heard
appellant's relevancy objection outside the presence of the jury and ruled that the
evidence of the knives would be admitted. "When the court hears objections to
offered evidence out of the presence of the jury and rules that such evidence be
admitted, such objections shall be deemed to apply to such evidence when it is
admitted before the jury without the necessity of repeating those objections." Tex.
R. Evid. 103(a)(1); see Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App.
1991).

 a. Relevant?

 Thus, we must decide whether the trial court abused its discretion in ruling that
the evidence regarding the knives was relevant and not unduly prejudicial. We
review a trial court's decision to admit or exclude evidence for abuse of discretion. 
Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996). Where the trial
court's evidentiary ruling is within the "zone of reasonable disagreement," there is
no abuse of discretion, and the reviewing court will uphold the trial court's ruling. 
Id. The exclusion of evidence does not result in reversible error unless it affects a
substantial right of the accused. See Tex. R. App. P. 44.2(b). Substantial rights are
affected when the error has a substantial and injurious effect or influence in
determining the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App.
1997).

 Evidence is relevant if it tends to make the existence of any consequential fact
more or less probable than it is without the evidence. Tex. R. Evid. 401; Rankin v.
State, 974 S.W.2d 707, 719 (Tex. Crim. App. 1998) (op. on reh'g). Appellant argues
that the knives that were recovered from the truck are irrelevant because the State did
not theorize that either of the knives was the murder weapon. Appellant points out
that the coroner was of the opinion that the victim's wounds were caused by a single-edged knife, but that the large knife recovered from appellant's truck was a double-edged knife. Appellant also points out that, in her closing argument, the prosecutor
argued that it was likely that appellant disposed of the actual murder weapon.

 We do not agree that appellant's possession of the double-edged knife was
irrelevant. The coroner testified that he was 75% certain that a single-edged knife
was used in the attack. That, of course, leaves a 25% chance that a double-edged
knife was used. The victim was killed with a knife, and a knife was recovered from
appellant's truck. There is no conclusive proof that the knife recovered from the
truck could not have been the murder weapon. It was within the province of the jury
to decide whether or not the knife recovered from the truck was the knife used by
appellant. As such, the double-edged knife was relevant. The Swiss army knife we
will address in our harmless error analysis below.

 b. Unduly Prejudicial?

 Having decided that at least one of the knives was relevant, we must now
decide whether the risk of unfair prejudice substantially outweighed the probative
value. Texas Rule of Evidence 403 favors the admission of relevant evidence, and
it presumes that relevant evidence will be more probative than prejudicial. Verbois
v. State, 909 S.W.2d 140, 142 (Tex. App.--Houston [14th Dist.] 1995, no pet.). The
burden is on the party opposing admissibility to demonstrate that the negative
attributes of the admitted evidence substantially outweigh its probative value. Id. 
The trial court's decision to admit the evidence should be overturned only on an
abuse of discretion, i.e., only when it is outside the zone of reasonable disagreement. 
Id.

 In this case, the risk of undue prejudice was that the jury would convict
appellant based on the fact that he carried an illegal knife. However, the prosecutor
never mentioned to the jury that the double-edged knife that was recovered from
appellant's truck was, in fact, illegal. Furthermore, the second knife recovered was
a Swiss Army knife, and was clearly not illegal. It is hard to see how the jury would
be unfairly prejudiced against appellant simply because two apparently legal knives
were recovered from his truck. Accordingly, we hold that the admission of the knives
did not violate Rule 403.

 c. Harmless Error?

 Even if we were to agree that the knives were irrelevant, we would nonetheless
conclude that the admission of the knives was harmless error. (5) The record shows that
the State did not emphasize the knives in presenting their case. Less than 5 pages of
a 35 volume reporter's record mention recovery of the knives. The prosecutor did not
mention the knives during her closing argument at all. Although the double-edged
knife was illegal, the State, by not mentioning that fact to the jury, lessened any
chance that the jury would convict appellant simply because he was a bad person who
carried illegal knives. Although the jury asked to see the knife recovered from
appellant's truck during deliberations, it is unlikely that it placed undue weight on the
knife in deciding whether to convict, especially in light of the State's argument that
the killer probably disposed of the murder weapon. Similarly, we find it hard to
imagine that the jury would place undue weight on the fact that the police recovered
an innocuous Swiss army knife, because such knives are not illegal and are commonly
carried by law-abiding citizens everyday. Therefore, even if we had found the knives
irrelevant, which we did not, we would nonetheless conclude that their admission did
not affect a substantial right of the accused.

 Accordingly, we overrule points of error 11, 12, and 13.

 2. The Clothes

 When the police searched appellant's apartment, they recovered a pair of dark
warm-up pants with boxer shorts still inside them and a dark thermal long-sleeved
shirt from the floor of appellant's closet. These clothes, generally, matched the
description of the clothes the murderer was wearing. In points of error 14-16,
appellant contends the trial court erred by admitting the clothes because they were
either (1) irrelevant, or (2) the probative value of the clothes was substantially
outweighed by the risk of undue prejudice. The State argues that the alleged error
was not preserved because appellant did not object every time the State presented
evidence about the clothes.

 In this instance, we agree with the State. There was no objection to the clothes
that was heard and ruled on outside the presence of the jury, as there was with the
knives. Therefore, appellant cannot rely on Rule of Evidence 103(a)(1) to preserve
error. To preserve error for appeal, appellant was required to make a timely, specific
objection at the earliest possible opportunity. See Penry v. State, 903 S.W.2d 715,
763 (Tex. Crim. App. 1995); Turner v. State, 805 S.W. 2d 423, 431 (Tex. Crim. App.
1991).

 Officer Sampson testified, without objection, that when he searched appellant's
apartment, he recovered clothes that were similar in appearance to those worn by the
man seen fleeing the scene of the murder. He also identified State's exhibits 225,
226, and 227 as the clothes that he recovered from appellant's apartment. The
prosecutor, however, did not move to introduce the clothes during Sampson's
testimony. Instead, the clothes were introduced through a later witness, Officer
Alfredo Mares, a member of HPD's Crime Scene Unit Division, who actually took
possession of the clothes at the scene of the search. Mares testified that exhibits 225,
226, and 227 were, in fact, the same clothes that he recovered from appellant's
apartment. The prosecutor then moved to introduce the clothes, and appellant's
counsel, for the first time, objected that the evidence of the clothes was irrelevant.

 Appellant's objection came too late because both Sampson and Mares had
already testified about the clothes, and the clothes had already been shown to the jury. 
See Thompson v. State, 691 S.W.2d 627, 635 (Tex. Crim. App. 1984) (stating timely
objection must be made as soon as ground of objection becomes apparent). 
Accordingly, we overrule points of error 14, 15, and 16.

C. Admission of Journal Confiscated at School in 1995 and Letters from 1996

 In points of error 17-26, appellant contends the trial court erred by denying his
motion to suppress evidence that was recovered as a result of a school search that
occurred in 1995, three years before the murder. A brief recitation of the pertinent
facts is appropriate.

 1. Background

 On April 10, 1995, appellant threw a beer can out of his car window as he
drove into the Bellaire High School parking lot at 10:30 in the morning. The can
almost hit Houston Independent School District (HISD) Officer Duggan, who, along
with HISD Officer-in-Training Griest, approached appellant and asked if he had been
drinking. Appellant told Duggan that he had been drinking, and that he had some
beer left over from a party the night before. He volunteered to show the officers the
beer in his trunk. Before beginning the search appellant's of trunk, Duggan radioed
Bellaire Police Officer Bartlett for help. The police found the beer in a cooler in
appellant's trunk and told appellant that, if he would pour it out, he would not be
charged as being a minor in possession of alcohol. Appellant poured out the beer. 
The officers, with appellant's consent, searched appellant's car and found three
marihuana cigarettes in the ashtray. The police also discovered a small novelty knife
on appellant's keychain, which was illegal because it was double-edged.

 Appellant was taken to the assistant principal's office and his parents were
notified. At the principal's office, appellant's backpack was searched to see if it
contained any other weapons or contraband. During the search, Officer Griest opened
a spiral notebook to look for drugs. She testified that they sometimes find smashed
marihuana, cocaine, and LSD in books. As she flipped through the pages of the
notebook, Officer Griest noticed a drawing of the devil with blood "all over it and
blood everywhere and it was just-it was striking." On the very next page was a title
"How to Kill a Woman." Officer Griest testified about what was written under that
title as follows:

 [Griest]: I remember that I read thoughts. It wasn't a poem, it wasn't a
letter and it took you from beginning to end. It took you - talked about
abducting. Talked about using a knife to make several cuts so that when
she bled, the body would be covered, I mean, in red. Talked about her
begging for her life. You could feel it. I mean, it was disturbing. 
Talked about her begging for her life and then the joy when she looked
into his eyes and he realized they were dead and that he had no use for
the bitch.


 [The prosecutor]: Do you remember the notebook saying anything about words
that he used?


 [Griest]: Yes.


 [The prosecutor]: What?


 [Griest]: Say things to her, Do you like it? Want me to do it some more? I'm
going to do this. Just really talking. It was very talkative to the victim while
she was being stabbed. Very tormenting. [The notebook described] how she
would sweat, how her eyes would look, just the terror. You could-it was like
reading the best novel you've ever read in your life.


 The notebook also contained a title "How to Rape a Woman," which Griest
described as follows:

 Talking about during penetration putting hands around her neck and her
begging him stop, her begging him till she couldn't beg anymore
because her air flow was getting cut off and getting erect when he let go
right before her body - right before, I guess, he said lifeless and she
would gasp for air and sexually turn him on.


 * * * * 


 There were several references. I mean, talked about urge to kill, talked
about having the-you know, the urge be [sic] so strong that he didn't
think he could fight it anymore. It was getting harder and harder. 
Contemplating suicide.


 Griest testified that she asked appellant why he would write such "sick shit"
and he replied, "I have thoughts." Appellant was then released into the custody of his
parents and the notebook was turned over to them. Appellant was charged with
possession of an illegal weapon and placed on juvenile probation.

 2. Reading Notebook an Illegal Search?

 Appellant contends that reading the notebook was an illegal search under the 
article 18.02(10) of the Texas Code of Criminal Procedure, which provides:

 A search warrant may be issued to search for and seize:

 (10) property or items, except the personal writings by the accused,
constituting evidence of an offense or constituting evidence tending to show
that a particular person committed an offense[.]


Tex. Code Crim. Proc. Ann. art. 18.02(10) (Vernon Supp. 2002).

 However, no search warrant was issued in this case, thus, article 18.02(10) is
not applicable. See Morton v. State, 761 S.W.2d 876, 879 (Tex. App.--Austin 1988,
pet. ref'd). Furthermore, we note that no search warrant is needed to perform a school
search of a student who is under the school's authority. See New Jersey v. T.L.O., 469
U.S. 325, 340, 105 S. Ct. 733, 742 (1985).

 To determine whether a school search is reasonable we must first determine
whether the search was justified at its inception. Coronado v. State, 835 S.W.2d 636,
640 (Tex. Crim. App. 1992) (citing T.L.O., 469 U.S. at 341, 105 S. Ct. at 742-43). 
A search is justified at its inception when there are reasonable grounds for suspecting
that the search will turn up evidence that the student has violated, or is violating,
either the law or the rules of the school. Id. Second, we must determine whether the
search, as actually conducted, was reasonably related in scope to the circumstances
that justified the initial interference. Id. A search is permissible in scope when the
measures adopted and used are reasonably related to the objectives of the search and
are not excessively intrusive in light of the age and sex of the student and the nature
of the infraction. Id.

 a. Justified at Inception?

 In this case, the HISD officers were justified in detaining and searching
appellant and his vehicle because Officer Duggan saw appellant throw a beer can out
his car window. This was evidence that both the law and school rules had been
violated. The further detention and search of appellant's backpack were likewise
justified because marihuana cigarettes were found in appellant's ashtray, and it was
reasonable for the officers to attempt to determine whether appellant was carrying
marihuana onto school premises. Officer Griest testified that she was flipping
through appellant's notebook because students often hid drugs in their books. 
Therefore, we conclude that the search of appellant's notebook was justified at its
inception because the officers had a reasonable ground for suspecting that appellant
was violating the law and school rules by carrying marihuana.

 b. Excessive in Scope?

 Appellant argues that, even if the HISD officers were justified in searching his
backpack, they exceeded the necessary scope of the search by reading the notebook. 
Again, we disagree. In determining that a warrant requirement was unnecessary for
school searches, the Supreme Court recognized "[t]he special need for an immediate
response to behavior that threatens either the safety of schoolchildren and teachers
or the educational process itself . . ." T.L.O., 469 U.S. 325, 353, 105 S. Ct. 733, 749. 
As we have learned from unfortunate events such as the school shootings at
Columbine High School in Littleton, Colorado, school officials must take seriously
perceived threats to the safety and well-being of their students and faculty.

 As we stated earlier, Officer Griest was conducting a reasonable search for
drugs in appellant's notebook when she noticed a picture of a demon dripping blood
and the title "How to Kill a Woman." We believe that the officer then had the right,
if not the responsibility, to read the passage in the notebook to determine whether it
constituted an immediate threat to a student or teacher at Bellaire High School.

 We do not agree with appellant's assertion that private writings are always
beyond the scope of a permissible school search. In fact, in T.L.O., the United States
Supreme Court held that it was permissible for a school administrator to read letters 
found in a student's purse, which implicated her in drug-dealing. 469 U.S. at 347,
105 S. Ct. at 746.

 Accordingly, we hold that appellant's notebook was seized and read pursuant
to a valid school search. There was no violation of Texas law or the Fourth
Amendment.

 3. Violation of Privilege Against Self-Incrimination?

 Appellant, citing Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524 (1886),
argues that admitting the notebook violated his Fifth Amendment right against self-incrimination. In Boyd, the Supreme Court held that a subpoena duces tecum
ordering the defendant to produce an invoice that established his guilt for non-payment of taxes was unconstitutional under the Fourth and Fifth Amendments. The
Court noted that it was "unable to perceive that the seizure of a man's private books
and papers to be used in evidence against him is substantially different from
compelling him to be a witness against himself." 116 U.S. at 633, 6 S. Ct. at 534. 
The Court further stated that "a compulsory production of the private books and
papers of the [defendant] . . . is compelling him to be a witness against himself, within
the meaning of the Fifth Amendment to the Constitution . . ." 116 U.S. at 634-35, 6
S. Ct. at 534-35.

 However, in the 1970's, the Supreme Court began to retreat from the "broad
statements" of Boyd. See Andresen v. Maryland, 427 U.S. 463, 472, 96 S. Ct. 2737,
2744 (1976) (noting, "the continued validity of the broad statements contained in
[Boyd and earlier cases] has been discredited by later opinions.").

 In Fisher v. United States, 425 U.S. 391, 408, 96 S. Ct. 1569, 1579-80 (1976),
the defendants, relying on Boyd, argued that the Fifth Amendment privilege against
self-incrimination protected them from complying with IRS summonses requiring
them to produce personal tax records prepared by the defendant's accountants. The
Court noted that the "Fifth Amendment does not independently proscribe the
compelled production of every sort of incriminating evidence but only applies when
the accused is compelled to make a testimonial communication that is incriminating." 
425 U.S. at 408, 96 S. Ct. at 1579. Because the preparation of the papers sought was
"wholly voluntary," the Court concluded that it was not "compelled testimonial
evidence." 425 U.S. at 409-410, 96 S. Ct. at 1580. The Court also noted that there
was no general Fifth Amendment right to privacy.

 Within the limits imposed by the language of the Fifth Amendment,
which we necessarily observe, the privilege truly serves privacy
interests; but the Court has never on any ground, personal privacy
included, applied the Fifth Amendment to prevent the otherwise proper
acquisition or use of evidence, which in the Court's view, did not
involve compelled testimonial self-incrimination of some sort.


 * * * *


 We cannot cut the Fifth Amendment completely loose from the
moorings of its language, and make it serve as a general protector of
privacy-a word not mentioned in its text and a concept directly
addressed in the Fourth Amendment. We adhere to the view that the
Fifth Amendment protects against "compelled self-incrimination, not
[the disclosure of] private information."


425 U.S. at 399-401, 96 S. Ct. at 1575-76.


 In Andresen v. Maryland, the police seized personal business records of the
defendant that they discovered while performing a search pursuant to a search
warrant. 427 U.S. at 466, 96 S. Ct. at 2741. The defendant argued that the
introduction of the documents into evidence violated his Fifth Amendment privilege
against self-incrimination. 427 U.S. at 469, 96 S. Ct. at 2743. The Supreme Court
disagreed, and, in doing so, elaborated on what the term "compelled self-incrimination" meant. 

 [P]etitioner was not asked to say or do anything. The records seized
contained statements that petitioner had voluntarily committed to
writing. The search for and seizure of these records were conducted by
law enforcement personnel. Finally, when these records were
introduced at trial, they were authenticated by a handwriting expert, not
by petitioner. Any compulsion of petitioner to speak, other than the
inherent psychological pressure to respond at trial to unfavorable
evidence, was not present.


 This case thus falls within the principle stated by Mr. Justice Holmes: 
"A party is privileged from producing the evidence but not from its
production." Johnson v. United States, 228 U.S. 457, 458 33 S. Ct., 572,
57 L.Ed. 919 (1913). This principle recognizes that the protection
afforded by the Self-Incrimination Clause of the Fifth Amendment
"adheres basically to the person, not to information that may incriminate
him." Couch v. United States, 409 U.S. at 328, 93 S. Ct. at 616. Thus,
although the Fifth Amendment may protect an individual from
complying with a subpoena for the production of his personal records in
his possession because the very act of production may constitute a
compulsory authentication of incriminating information, a seizure of the
same materials by law enforcement officers differs in a crucial respect[,]
the individual against whom the search is directed is not required to aid
in the discovery, production, or authentication of incriminating
evidence.


427 U.S. at 473-74, 96 S. Ct. at 2745. The Supreme Court concluded that, "because
the statements seized were voluntarily committed to paper before police arrived to
search for them" appellant was not compelled to give evidence against himself.
427U.S. at 477, 96 S. Ct. at 2746-47.

 Finally, in United States v. Doe, 465 U.S. 605, 104 S. Ct. 1237 (1984), the
Court again concluded that, because the personal documents at issue in the case were
prepared voluntarily, they "'cannot be said to contain compelled testimonial
evidence' in and of themelves." 465 U.S. at 612 n.9; 104 S. Ct. at 1242 n.9. Even
though the documents at issue in Doe were personal business records, the Court,
without limitation stated, "If the party asserting the Fifth Amendment privilege has
voluntarily compiled the document, no compulsion is present and the contents of the
document are not privileged." 465 U.S. at 612 n. 10, 104 S. Ct. at 1242 n.10.

 At least four federal courts of appeals have concluded that the Fifth
Amendment does not protect documents, business or personal, that were voluntarily
prepared. See In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992 v.
Doe, 1 F.3d 87, 93 (2nd Cir. 1993) (holding calendar prepared by grand jury target
not protected by Fifth Amendment privilege); United States v. Wujkowski, 929 F.2d
981, 983 (4th Cir. 1991) (holding appointment books and records relating to vacation
home not protected by Fifth Amendment privilege); In re Sealed Case, 877 F.2d 83,
84 (D.C. Cir. 1989) (holding privilege does not cover contents of any voluntarily
prepared records, whether personal or business); In re Grand Jury Proceedings on
Feb. 4, 1982, 759 F. 2d 1418, 1419 (9th Cir. 1985) (holding contents of business and
personal documents not privileged unless created under compulsion).

 This interpretation is supported by Justice O'Connor's concurring opinion in
United States v. Doe, wherein she writes:

 I write separately . . . just to make explicit what is implicit in the
analysis of [the Court's] opinion: that the Fifth Amendment provides
absolutely no protection for the contents of private papers of any kind. 
The notion that the Fifth Amendment protects the privacy of papers
originated in Boyd v. United States, but our decision in Fisher v. United
States, sounded the death knell for Boyd. "Several of Boyd's express or
implicit declarations [had] not stood the test of time," and its privacy of
papers concept "ha[d] long been a rule searching for a rationale . . ." 
Today's decision puts a long overdue end to that fruitless search.


465 U.S. at 618, 104 S. Ct. at 1245 (citations omitted) (emphasis added). As the
Second Circuit has stated, "The [Supreme] Court no longer views the Fifth
Amendment as a general protector of privacy or private information, but leaves that
role to the Fourth Amendment." In re Grand Jury Subpoena Duces Tecum Dated
October 29, 1992 v. Doe, 1 F.3d at 93. 

 Applying the rationale of Fisher, Andresen, and Doe, we hold that the
admission of appellant's notebook into evidence does not violate his Fifth
Amendment privilege against self-incrimination. The notebook was discovered by
HISD officials during a search that we have already held met the reasonableness
requirement of the Fourth Amendment. Appellant was under no compulsion to
produce the notebook-it was seized during a lawful search. Additionally, appellant
voluntarily created the notebook and the drawings and essays contained therein. 
Again, there was no compulsion by the State. The Fifth Amendment generally
provides no further protection for private papers than that provided by the Fourth
Amendment (6), which we have already held was not violated.

 4. Violation of Right to Privacy and Free Expression

 Appellant also argues that even if his Fifth Amendment rights were not violated
by the admission of the notebook, his First Amendment right to privacy and free
expression was violated. Appellant argues that "[i]f the First Amendment means
anything, it means that the state has no business telling a man what to think." We
agree that the State cannot criminalize thoughts. See Texas v. Johnson, 491 U.S. 397,
414, 109 S. Ct. 2533, 2544 (1989) ("[T]he government may not prohibit the
expression of an idea simply because society finds the idea itself offensive or
disagreeable"). However, in this case, appellant was not on trial for having
murderous thoughts-he was on trial for acting on those murderous thoughts. As such,
he was prosecuted for his actions, not his thoughts.

 However, the First Amendment also prevents a state from using evidence of a
defendant's abstract beliefs against him at trial, unless those beliefs have a bearing
on the issues in the case. See Dawson v. Delaware, 503 U.S. 159, 167-68, 112 S. Ct.
1093, 1098-99 (1992) (holding defendant's association with white racist prison gang
inadmissible at punishment phase because not related to relevant issue in case). 
Therefore, the issue is not whether appellant's notebook was protected First
Amendment speech, but whether it was relevant to an issue in the case. (7) Thus, we
turn to appellant's argument that his notebook, which was written three years before
the crime, was irrelevant.

 5. Relevancy of Appellant's Notebook and Letters to his Friend

 a. Background

 In 1995, three years before the offense, appellant wrote the essay "How to Kill
a Woman," which we have described above. In 1996, two years before the offense,
appellant wrote letters to his friend, Josh Vogel, in which he stated that he wanted to
kill Josh's girlfriend by "popping her head like a zit." Appellant also told Josh that
he wanted to kill his own girlfriend by cutting her throat. Appellant told Josh, "I'm
changing into a violent young man and I like it."

 At trial, appellant argued that the notebook and the letters to Vogel were
irrelevant and/or unfairly prejudicial.

 b. Relevancy 

 As we stated earlier, evidence is relevant if it tends to make the existence of
any consequential fact more or less probable than it is without the evidence. Tex. R.
Evid. 401; Rankin, 974 S.W.2d at 719-20. The State argues that the evidence was
relevant to show motive, intent, and identity. We agree.

 The main issue in this case was whether the eyewitnesses had correctly
identified appellant as the man they saw running from the wig shop after the murder. 
Appellant presented substantial evidence attempting to cast doubt on the reliability
of the eyewitness testimony. However, appellant's notebook tended to corroborate
the eyewitness testimony because in it, appellant used very similar words to describe
how he would kill a woman as the assailant used when he attacked Mrs. Ingrando. (8) 
Therefore, the similarity between appellant's fantasy, as revealed in his notebook, and
the actual event as it occurred, make it more likely that appellant was, in fact, the
murderer. Therefore, the notebook was relevant to the issue of identity.

 The notebook and the letters were both relevant to the issue of motive. In this
crime, there was no obvious motive. There was no robbery and no personal animosity
between appellant and his victims. However, the diary and the letters to Vogel
presented the only plausible evidence of why appellant, an apparently average teen-ager from an affluent family, would commit such a heinous and random murder. The
diary and letters showed that appellant had written about his murderous fantasies,
thus providing evidence of motive, i.e., the fulfillment of his fantasies by acting on
them several years later.

 In Paschal v. State, 35 S.W.2d 80, 81-82 (Tex. App.--Texarkana 2000, no
pet.), the State introduced four notes that the defendant had written to his girlfriend. 
In the notes, the defendant expressed hatred, disgust, and a desire of vengeance
against the victim. Id. at 82. The court held that the notes were relevant to provide
a motive for committing aggravated assault. Id.

 Accordingly, we hold that the notebook and letters were admissible to show
identity and motive.

 c. Unfair Prejudice

 Appellant also argues that the admission of the notebook violated Tex. R. Evid.
403 because its probative value was substantially outweighed by the danger of unfair
prejudice. Even if evidence is relevant, the trial court may nevertheless exclude it if
the court determines that the probative value of the extraneous act evidence is
substantially outweighed by unfair prejudice. Tex. R. Evid. 403. When the trial
court balances probativeness and prejudice, a presumption exists favoring probative
value. Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990). As long
as the trial judge "operates within the boundaries of [his or her] discretion," in
performing such a balancing test, an appellate court should not disturb the decision,
whatever it may be. Id. at 390. 

 A Rule 403 balancing test by the trial court includes the following
considerations:

 1. how compellingly the extraneous evidence serves to make a fact of
consequence more or less probable--a factor which is related to the
strength of the evidence presented by the proponent to show the
defendant in fact committed the extraneous offense;


 2. the potential the other evidence has to impress the jury "in some
irrational but nevertheless indelible way";


 3. the time the proponent will need to develop the evidence, during
which the jury will be distracted from consideration of the indicted
offense;


 4. the force of the proponent's need for this evidence to prove a fact of
consequence, i.e., does the proponent have other probative evidence
available to him to help establish this fact, and is this fact related to an
issue in dispute. 

 

See Wyatt v. State, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000).

 In this case, the evidence of the notebook and letters was compelling evidence
of motive and identity because the language used in the writings was strikingly
similar to that used by the murderer. However, the evidence, as the State concedes, 
was very prejudicial because it exposed appellant's murderous fantasies to the jury. 
The evidence was also fairly time-consuming because the State had to bring in an
HISD officer to testify about the 1995 school search. But, finally, we note that the
State's need for the evidence in this case was extremely great to establish both
identity and motive. Although there were several eyewitnesses that identified
appellant as the murderer, these witnesses's credibility was vigorously attacked on
cross-examination. In fact, the defense brought an expert witness to testify about the
fallibility of eyewitness testimony. Therefore, the State needed to admit appellant's
very similar writings to show that he was, in fact, the person that committed the
crime. Likewise, without the evidence from the notebook and letters, the State would
have had no evidence to explain why a seemingly normal teenager would commit
such a senseless crime. 

 d. Remoteness

 Finally, appellant argues that the notebooks and letters were irrelevant because
they were too remote to have any probative value. Appellant cites United States v.
Beechum, 582 F. 2d 898, 915 (5th Cir. 1978), which held that the temporal
remoteness of an extraneous offense decreases the probity of the extraneous offense
evidence. We begin by noting that the notebook and letters were not extraneous
offenses. See Moreno v. State, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (stating
inchoate thoughts do not amount to extraneous acts). Furthermore, we do not agree
with appellant that the evidence at issue lost all relevance simply because of the
passage of time. Accordingly, we conclude that the trial court did not err by
determining that the risk of unfair prejudice did not substantially outweigh the
probative value of the notebook and letters.

 6. Violation of Family Code?

 Appellant also argues that the trial court erred by admitting appellant's
personal writings because they were obtained in violation of Tex. Fam. Code Ann.
§ 52.02 (Vernon Supp. 2002), which provides:

 (a) Except as provided by Subsection (c), a person taking a child into
custody, without unnecessary delay and without first taking the child to
any place other than a juvenile processing office designated under
Section 52.025, shall do one of the following:


 (1) release the child to a parent, guardian, custodian of the child,
or other responsible adult upon that person's promise to bring the
child before the juvenile court as requested by the court[.]


Id. Based on the record before us, we conclude that the State complied with section
52.02(a) by immediately calling appellant's parents, and then releasing him to their
custody.

 7. Conclusion Regarding Admission of 1995 Notebook and 1996 Letters

 Because we have overruled all issues that appellant has presented on the
admission of the notebook and the letters, we overrule points of error 17-29 and 33-35.

D. Admission of the Novelty Knife from Appellant's Keychain

 When appellant was searched in 1995 on the Bellaire High School Campus,
police discovered a small, double-edged knife on his keychain. Appellant contends
the trial court erred by admitting evidence of the knife, which he contends was
irrelevant and unfairly prejudicial. The State contends that appellant "opened the
door" to the admission of the evidence. We follow the usual standard of review. See
Green v. State, 934 S.W.2d at 101-02.

 At trial, the defense called Dr. Richard Austin, a clinical psychologist, to testify
for appellant. Dr. Austin testified that he had treated appellant in 1995 after the
incident at Bellaire High School. He was asked on direct examination: "Were you
told about some notebook that he had with him when he had the problem at Bellaire?" 
Dr. Austin responded, "Yes." He went on to conclude that appellant had shown
improvement and needed no further psychological treatment.

 The prosecutor then argued to the trial court that by questioning Dr. Austin
about the notebook, appellant had created the impression that Dr. Austin was familiar
with the notebook and the circumstances of the 1995 incident, and that the State was
entitled to go into more detail to determine the extent of Dr. Austin's knowledge.

 [the prosecutor]: It's the State's position with this witness the defense
has opened the door to the other page in the diary about how to rape a
woman and all of the things that were in the notebook. He's come in
here to testify about the fact he seemed fine and normal, didn't need any
more psychotherapy and we have the right to ask him about what all he
knew.


 [defense counsel]: I don't think the door's been opened at all. In fact,
the questioning about it is from the State. The State brought out at first
that Dr. Austin had been seeing or had seen him and what we've brought
out, yes, he'd seen him. He was told-they asked about [appellant's
mother] when she told him about the diary, he couldn't remember
whether he did or not learn about the diary, but the diary didn't exist. 
He says he hasn't seen it up to now. For the State to go through what
they've claimed is not proper.


 [the court]: I agree with the State the door has been opened. The
implication that he knew some things about a diary and he's not the one
that saw the notebook, I think the implication to the jury is this man
drew things about him and he gave him a passing bill and by the
witness' own statement, there are some things that were written in that
diary, and I agree with the State. I think they have the right to explore
what this man knew when he gave them the passing grade of being
absolutely find and that he did not need follow-up. I'm going to allow
it.


 [defense counsel]: There's another issue. In his notes there's also
reference to dagger, there's also reference to being on probation and
seeing a probation officer. We haven't opened any door to either of
those. I object to it.


 [the court]: I've never known anything about probation and I don't think
there's any relevance about whether or not he was on probation, but if
he's giving him - if he's talking about violence with women or violence
in general, I think that the State has the right to explore him possessing
a dagger as well. I think the door's been opened as well by the
implication of the defense questions going into that but not into the fact
about anything about a [probation].


 * * * * 


 The knife at the time of the Bellaire incident, not that it is an illegal
weapon, but the fact that he did have a knife at that point, I think that
goes into his diagnosis whether he knew about that. He just testified
that he gives this guy a clean bill of health and the State has a right to
find out what he knew.


 Thereafter, Dr. Austin acknowledged that appellant had a dagger with him
when he was stopped on the Bellaire High School campus. He also testified that he
would have found it alarming if he had known that appellant's diary included a
passage about using a knife to kill a woman.

 By testifying that, in his expert opinion, appellant required no further
psychological treatment, we agree that Dr. Austin "opened the door" for the State to
challenge the basis of that knowledge by asking whether Dr. Austin what he knew
about the facts of appellant's 1995 incident at Bellaire High School. Evidence that
appellant was carrying a dagger on campus when he was stopped, and that his diary
detailed killing a woman with a knife, was relevant because it tended to affect the
weight the jury would give to Dr. Austin's expert opinion. By presenting Dr.
Austin's testimony, appellant created an issue of whether or not he required further
psychological counseling after the 1995 incident at Bellaire High School. As such,
the circumstances of the incident, including the contents of the diary and the fact that
appellant was carrying a knife, were relevant. Accordingly, we overrule points of
error 30-32.

E. The Line-Up Procedures

 In points of error 36-41, appellant contends the trial court erred by permitting 
Dr. Beckman and Mrs. Ingrando to identify appellant as the murderer before the jury
after both had viewed an impermissibly suggestive pre-trial line-up. To determine the
admissibility of an in-court identification that is challenged by a defendant we follow
a two-step analysis. First, we consider whether the pretrial identification procedure
was impermissibly suggestive. Barley v. State, 906 S.W.2d 27, 33 (Tex. Crim. App.
1995). Second, if the procedure was impermissibly suggestive, we determine whether
the procedure created a very substantial likelihood of irreparable misidentification. 
Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); Barley, 906
S.W.2d at 33. It is this second prong that directly implicates a defendant's due
process rights. Simmons, 390 U.S. at 381, 88 S Ct. at 970. It is the defendant's
burden to prove these two elements by clear and convincing evidence. Barley, 906
S.W.2d at 34. If the defendant is able to do so, the in-court identification is
inadmissible, unless the State can prove by clear and convincing evidence that the
identification was of "independent origin." United States v. Wade, 388 U.S. 218,
240-41, 87 S. Ct. 1926, 1939 (1967); Williams v. State, 477 S.W.2d 885, 889 (Tex.
Crim. App. 1972). 

 We will discuss each witness's identification separately to determine whether
the pretrial procedures used were impermissibly suggestive.

 1. Dr. Beckman

 a. The photospread

 Approximately four and one-half hours after the murder, Dr. Beckman was
asked to view a photospread to see if he could identify the man he had seen running
from the wig shop. Appellant's photograph was number three in the photospread. 
Dr. Beckman said that number three looked like the person he saw, but he couldn't
be sure. The police then asked Beckman how sure he was on a scale of one to 10, and
Beckman responded "eight."

 Appellant contends the photospread was "suggestive on its face," but does not
explain how it was suggestive. We have reviewed the photospread and do not find
it "suggestive on its face." The photospread includes six photographs, of equally
poor quality, of young men with light blond to dark brown hair. All of the
photographs are the same size and shape and taken from approximately the same
perspective, and the photograph of appellant is not distinctive in any manner.

 Appellant also contends that the photospread should be suppressed because the
police tainted the procedure by asking Beckman to assign a percentage of certainty
to his tentative identification of appellant. We disagree. While the police did attempt
to quantify Beckman's level of certainty, they did not suggest what percentage would
be appropriate.

 Accordingly, we conclude that the trial court did not abuse its discretion by
permitting the evidence that Dr. Beckman had identified appellant from the
photospread.

 b. The Videotaped Line-up

 Approximately one week after the murder, the police met with Dr. Beckman
at his house and had him view a videotaped line-up. Appellant was in the fifth
position in the videotaped line-up. Again, Dr. Beckman indicated that he was 80%
sure that the person he saw running from the wig shop was the person in the fifth
position on the videotaped line-up.

 Appellant contends that the videotaped line-up was impermissibly suggestive
because he was the only person that appeared in both the photospread and the
videotaped line-up.

 In Cantu v. State, 738 S.W.2d 249 (Tex. Crim. App. 1987), the court
acknowledged that showing a witness several photographic displays on different
occasions, each containing a photograph of a defendant, when the witness has not
previously identified the defendant, is a suggestive procedure. Id. at 251-52. "Such
procedure tends to highlight a particular defendant since the witness sees the same
face repeatedly. Such reoccurrence of one particular face might suggest to the
witness that the police think the defendant is the culprit." Id. at 252. However, the
court further noted that "[n]ot every case in which several arrays or displays of a
defendant containing different pictures of a defendant are suggestive." Id. (emphasis
added). "It may be necessary to show a witness different pictures because a
defendant may have several 'different looks', i.e., different ages, clean shaven and
bearded looks. Suggestiveness must be determined by the circumstances of each
case." Id. The court concluded that the procedure used in Cantu was suggestive
because two of the three photographic line-ups contained the same picture of the
defendant and there was no evidence about how the photograph in the third line-up
was any different from the other two. Id.

 We believe that Cantu is distinguishable because, in this case, the police did
not show the same or similar photograph of appellant in both line-ups. The first
identification was made based on the photographic line-up. The second line-up
clearly presented a different image of appellant because it was not simply a "head
shot" photograph of appellant, but a live action, albeit videotaped, image of appellant
walking through the line-up procedure. Therefore, we conclude that, under the facts
of this case, showing Dr. Beckman two line-ups, each containing appellant's image,
was not a suggestive procedure because the images presented of appellant were
sufficiently different. See Benitez v. State, 5 S.W.3d 915, 922 (Tex. App.--Amarillo
1999, pet. ref'd) (holding that multiple line-ups containing different images of
defendant not suggestive procedure).

 Because the line-up procedures were not suggestive, the trial court did not err
by permitting Dr. Beckman to identify appellant at trial. Accordingly, we overrule
points of error 36-38.

 2. Mrs. Ingrando 

 Mrs. Ingrando was not able to view the photographic line-up on the day of the
offense because she was in the hospital. However, she was released from the hospital
on December 7, 1998, and, a few days later, the police showed her the same
videotaped line-up they had shown Dr. Beckman. An audiotape was made of the
proceeding, and the transcript of that audiotape contains the following:

 [Mrs. Ingrando]: Ok then uh, well it would be the (inaudible) one

 [police officer]: The fifth one

 [Mrs. Ingrando]: It kinda, it kinda scare me. 

 * * * *

 [police officer]: OK, alright. Number, number five is the one you
identified. Is that what you are saying?


 [Mrs. Ingrando]: The one that scared me the most

 [police officer]: OK

 [Mrs. Ingrando]: I feel like it

 [police officer]: Like he's the one that did it. How sure are you? On a
scale of one through then (sic), I asked you this earlier. On a scale of
one throught (sic) ten, one being weak and ten being strong.


 [Mrs. Ingrando]: OK, I would say probably eighty

 [police officer]: Eighty percent?

 [Mrs. Ingrando]: Yes

 * * * *

 [Mrs. Ingrando]: [Number 5 is] the one I feel very strongly about

 [police officer]: OK, very strongly. OK

 [Mrs. Ingrando]: Yeah

 * * * *

 [police officer]: OK. And do you wanna file charges on this man?

 [Mrs. Ingrando]: Oh yes, of course

 [police officer]: OK

 [Mrs. Ingrando]: I wanna try to find out if its really him, yes

 Appellant again argues that they police "extracted an artificial 80% degree of
certainty" from Mrs. Ingrando, when all she had said was that appellant "scared her." 
As we stated with Dr. Beckman, there is nothing suggestive in requesting the witness
to attempt to quantify his or her degree of certainty. We do not agree that Mrs.
Ingrando's statement that she wanted to "find out if it's really him" indicated that the
police, not Mrs. Ingrando, had identified appellant. Mrs. Ingrando had just stated that
she was only 80% certain in her identification-her desire to see appellant in person
"to find out if it's really him" is not inconsistent with her somewhat tentative
identification of him from the videotaped line-up. 

 Because we find nothing suggestive in the videotaped line-up procedures
employed in Mrs. Ingrando's pretrial identification of appellant, we hold that the trial
court did not err by allowing Mrs. Ingrando to identify appellant at trial.

 Accordingly, we overrule points of error 39-41.

F. Admission of Post-Indictment Statements Made to German Police

 In points of error 42-46, appellant contends the trial court erred by denying his
motion to suppress all post-indictment statements that appellant made to German
police when he was arrested. Specifically, appellant argues that admission of the
statements violated: (1) his Sixth Amendment right to counsel because he was under
indictment at the time and; (2) article 38.22 of the Texas Code of Criminal Procedure
because the statements were not recorded.

 1. Facts

 Appellant was indicted on February 17, 1999, but Houston police were not able
to arrest him immediately because he had left the country. Instead, the police
obtained a federal warrant, which was relayed to the State Department, who passed
the information on to Interpol.

 On June 21, 1999, appellant was traveling from Bangkok to Mexico City. His
flight had a layover in Frankfurt Germany. During the layover, appellant left the
transit area of the airport to get a drink or newspaper, so he had to present his
passport. (9) When he did so, the German police discovered the outstanding warrant.

 Officer Thorsten Raupach of the Border Police Department testified that he told
appellant he was under arrest because of a murder warrant. Appellant replied that he
knew about the arrest warrant. Officer Raupach asked appellant how he knew, and
appellant said that his father had told him on the telephone. When filling out the
arrest report, appellant responded that he was a student and had been traveling in
Bangkok, and was going to visit Mexico City. Officer Raupach asked appellant
where he was going after Mexico City, and appellant replied, "Miami." However,
appellant had no tickets for any travel beyond Mexico City. 

 Officer Raupach asked appellant if he knew why the police were looking for
him. Appellant responded that a woman had been hit by a car and that some
witnesses saw the license plate, which was registered to his mother. He said that,
because his mother was at work, the police thought it must have been him driving the
car. 

 Officer Raupach searched appellant's backpack and found a bag of pills. When
he asked appellant what the pills were for, appellant responded that they were for
epilepsy. The officer then took appellant to a clinic so that he could take his
medicine. Appellant explained to the doctor in the clinic that the medicine was for
epilepsy. 

 When Officer Raupach told appellant that if he had not left the transit area he
would not have had to show his passport, appellant asked Raupach what the German
word for "stupid" was. Officer Raupach also told appellant that he was entitled to
make one phone call to someone in Germany. Appellant called the American
Consulate and spoke to a Mrs. Plate, while Office Raupach waited nearby. Appellant
repeated the story about a car accident, and then asked the Consulate to call his father
and his attorney.

 After Officer Raupach learned the details of the offense for which appellant
was arrested, he asked appellant about it and appellant said, "No, no, I wasn't there."

 Thus, the statements at issue are:

 1. Appellant's statement that he knew he was wanted for murder.


 2. Appellant's statement that his father had told him on the telephone
that he was wanted for murder in the United States.


 3. Appellant's statement that he was wanted because someone ran over
a woman in his mother's car and the police thought he was the driver.


 4. Appellant's statement that he needed the pills in his backpack for
epilepsy.


 5. Appellant's statement that after he visited Mexico City he intended
to proceed to Miami.


 b. No Custodial Interrogation


 We begin by noting that statement no. 1 was not made in response to custodial
interrogation. When Officer Raupach told appellant he was wanted for murder,
appellant volunteered that he knew. Thus, statement no. 1 was volunteered; it was
not a response to custodial interrogation.

 We also note that, even though Raupach asked appellant why he was wanted
for murder, and appellant responded with the story about the car accident, appellant
voluntarily repeated the same story to Mrs. Plate at the American Consulate. 
Appellant's statements to Mrs. Plate, which were made in Officer Raupach's
presence, were made volunteered and, thus, were not the product of any questioning. 
Therefore, the substance of statement no. 3 was admissible.

 Finally, we note that appellant told the doctor at the airport clinic that he
needed the pills from his backpack for epilepsy. This statement was not in response
to any questioning; thus, statement no. 4 was not the product of custodial
interrogation.

 Therefore, in our analysis of appellant's points of error we address only
statements no. 2 & 5, i.e., that appellant knew he was wanted for murder because his
father told him on the telephone, and that appellant planned to travel to Miami after
he visited Mexico City.

 c. Sixth Amendment

 Appellant concedes that Officer Raupauch had no duty under the Fifth or
Fourteenth Amendment to provide Miranda warnings to appellant before appellant's
statements could be offered against him at trial in Texas. See Alvarado v. State, 853
S.W.2d 17, 21, (Tex. Crim. App. 1993). However, appellant argues that the Alvarado
opinion does not address the issue of his Sixth Amendment right to counsel after
indictment.

 The State acknowledges that Alvarado deals only with the Fifth and Fourteenth
Amendments, but argues that its reasoning is equally applicable to appellant's claims
under the Sixth Amendment. We agree.

 In Alvarado, the defendant, a United States, shot and killed a man in El Paso
and then fled to Juarez, Mexico. 853 S.W.2d at 19. The El Paso police notified the
authorities in Juarez that appellant was a suspect for a murder committed in the
United States and was believed to be in Juarez. Id. The Mexican police apprehended
the defendant, and following the Mexican Code of Criminal Procedure, obtained a
written statement from the defendant in which he confessed to the murder. Id. At
trial, appellant moved to suppress his confession, arguing that the Mexican police
violated his rights under the Fifth and Fourteen Amendments. Id. at 19-20.

 The Court of Criminal Appeals held that "Miranda warnings are not essential
to the validity of a confession which has been obtained in a foreign country by
foreign officials." Id. at 20-21. 

 The rationale for such a rule was explained in Kilday v. United States,
"the United States Constitution cannot compel such specific, affirmative
action by foreign sovereigns, [such as requiring the Miranda warnings,]
so the policy of deterring so-called "third degree" police tactics, which
underlies the Miranda exclusionary rule, is inapposite to [cases where
a suspect is interrogated by foreign authorities]."


 * * * *


 The clear import of Miranda is to require U.S. officials to notify accused
persons of their constitutionally protected rights prior to any
questioning. This prophylactic measure, protects our citizens from our
state and our federal governmental actions. We know of no
constitutional objective that would be served by extending Miranda to
cases outside our borders.


Id., quoting Kilday v. United States, 481 F.2d 655, 656 (5th Cir. 1973) (emphasis
added).

 Just as Miranda and the Fifth Amendment protect U.S. citizens from our
government's actions, so does the Sixth Amendment. Therefore, we agree that the
general rule is that the questioning by foreign police, of a citizen under indictment in 
the United States, without the presence of an attorney, does not violate the Sixth
Amendment.

 i. "Shocks the Conscience" Exception

 However, as the Alvarado court explained, there are two exceptions to the
general rule. First, a confession made to foreign police will be excluded, even if
lawful in the foreign jurisdiction, if the circumstances of the confession "shocks [sic]
the conscience of an American Court." Id. at 21-22. Nothing about the questioning
in this case "shocks the conscience." In fact, appellant himself commented to both
the German police and the American Consulate about how well he was treated in
Germany.

 ii. "Agent of the State" Exception

 A second exception to the general rule of admissibility of confessions made to
foreign police is "when U.S. law enforcement personnel participate in the foreign
interrogation or if the foreign authorities are acting as agents for their U.S.
counterparts." Id. at 22. The burden is on appellant, as the party asserting the
existence of such an agency, to prove it. Id. at 22-23. We review the trial court's
implied finding of "no agency relationship" for an abuse of discretion. See id. at 23.

 In Alvarado, the court found that no agency relationship existed between the
United States and Mexico. In so holding, the court noted that American officials did
not participate in taking the confession, and that "mere notification of the potential
existence of a criminal in another police's jurisdiction is not enough to create such
a relationship." Id. at 23-24.

 Texas border officials consistently notify their Mexican counterparts
when a fugitive crosses the border. We view this as good police
practice, rather than evidence that establishes a joint venture
relationship. If this alone were to create a joint venture relationship, our
sister states' police officers would become agents of our State's law
enforcement personnel simply because we notified them of the
movement of a fugitive. This is clearly not the intended result, not do
we so conclude.


Id. at 24.

 In this case, we cannot say that the trial court abused its discretion by
concluding that appellant had failed to prove the existence of an agency relationship
between Texas and German police. The record shows only that appellant was
arrested because German police, via Interpol, discovered that there was a federal
warrant out for appellant's arrest. As such, the record shows only that German police
were made aware of the presence of a criminal within their borders. There was no
indication that Texas police requested, or even tacitly approved of the questioning of
appellant by German police. As such, it cannot be said that German police were
acting for Texas police at the time of the questioning.

 Because the questioning was not by an "agent of the state of Texas," the
admission of appellant's statements to the German police does not violate the Sixth
Amendment. See State v. Hernandez, 842 S.W.2d 306, 317-18 (Tex. App.--San
Antonio 1992, pet. ref'd) (holding that post-indictment questioning by reporter did
not violate Sixth Amendment because reporter was not state agent).

 d. Code of Criminal Procedure Article 38.22

 i. Error? 

 Appellant also contends that the questioning by the German police violated
article 38.22 of the Code of Criminal Procedure because it was not electronically
recorded. Article 38.22 provides in part:

 No oral or sign language statement of an accused made as a result of
custodial interrogation shall be admissible against the accused in a
criminal proceeding unless:


 an electronic recording, which may include motion picture,
video tape, or other visual recording, is made of the
statement. 


Tex. Code Crim. Proc. Ann. art. 38.22, §3(a)(1) (Vernon Supp. 2002). The Court
of Criminal Appeals has held that, unlike Miranda and the Fifth Amendment [and
presumably the Sixth Amendment also], article 38.22 is a procedural evidentiary rule,
and that, because the law of the forum applies to procedural rules, a statement taken
in a foreign jurisdiction must nonetheless comply with article 38.22 or it will not be
admissible in Texas. See Davidson v. State, 25 S.W. 3d 183, 186 (Tex. Crim. App.
2000). In Davidson, the court held that an unrecorded statement taken by a Unites
States Customs Agent in Montana was inadmissible because it violated article 38.22,
even though the statement complied fully with the laws of Montana. Id. at 185-86.

 Bound as we are to follow Davidson, we conclude that the statements appellant
made to the German police are inadmissible in Texas because they were not
electronically recorded as required by article 38.22. Thus, we turn to the issue of
harm.

 ii. Harm?

 Because article 38.22 is a statutory violation, and not of constitutional
magnitude, we must disregard the error unless it affected "substantial rights" of the
appellant. Tex. R. App. P. 44.2(b). As we stated above, appellant repeated most of
the statements he made to Officer Raupach to either the German doctor at the airport
or the American Consulate. The statements to those parties were not made in
response to custodial interrogation. Thus, the admission of the same information
through Officer Raupach was harmless error.

 Furthermore, admission of the remaining statements--that appellant knew he
was wanted for murder because his father told him on the telephone and that appellant
planned to travel to Miami after leaving Mexico--did not affect "substantial rights"
of appellant. Appellant had already volunteered information to Officer Raupach that
he knew he was wanted for murder. Further questioning by Officer Raupach only
elicited how appellant knew that fact, i.e., that his father had told him on the
telephone. The information that appellant was planning to travel to Miami after
leaving Mexico was hardly any more damning than the evidence, properly admitted,
that he did not have tickets to travel to Houston, even though there were direct flights
from Frankfurt to Houston daily, and appellant knew he was under indictment in
Houston. Neither of the statements touched on the key issue in the case of whether
appellant had been properly identified as the murderer. As such, we conclude that
admitting the statements appellant made to the German Police did not have "a
substantial and injurious effect or influence in determining the jury's verdict." King
v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

 Accordingly, we overrule points of error 42-46.

G. Batson Issue-Exclusion of Women From the Jury

 In points of error 47-49, appellant contends the trial court erred by permitting
the State to use its peremptory strikes to exclude women from the jury. In Batson v.
Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), the Supreme Court held the State's
use of racially discriminatory peremptory challenges violated the Equal Protection
Clause. The rationale and holding of Batson has been extended to gender. J.E.B. v.
Alabama ex rel. T.B., 511 U.S. 127, 145, 114 S. Ct. 1419 (1994); Fritz v. State, 946
S.W.2d 844, 847 (Tex. Crim. App. 1997). Trial courts follow a three-step process
when confronted with a Batson challenge. First, the defendant must make a prima
facie showing that the strike was made on an impermissible basis (e.g., race or sex).
If a prima facie case is made, the burden of production shifts to the State to provide
a neutral reason for the strike. If a neutral explanation is proffered, the defendant
must prove purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 767-78, 115
S. Ct. 1769, 1770-71 (1995); Ladd v. State, 3 S.W.3d 547, 563 (Tex. Crim. App.
1999) . Appellate courts review the trial court's ruling on a Batson motion under the
clearly erroneous standard of review. See Pondexter v. State, 942 S.W.2d 577, 581
(Tex. Crim. App. 1996). To hold the trial court's decision was clearly erroneous, the
appellate court must be left with a "definite and firm conviction that a mistake has
been committed." Vargas v. State, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992).

 a. Facts

 During voir dire, the following exchange took place:

 [defense counsel]: We move to quash the jury panel because of a
violation of the rule on Batson and they're allowed challenges made
certainly on the basis of racial relations. Juror No. 8 struck by the -
struck based on the person's Jewish religion. The defendant is Jewish
ans so is his family.


 [the court]: That's it?


 [defense counsel]: Yes.


 [the court]: I do not find based on that sufficient reason for the State to
say any reason why they struck that person, but in an abundance of
caution, I would like [the prosecutor] to state your reason for striking no.
8.


 [defense counsel]: 18, no. 8.


 [the prosecutor]: Judge, I'm not sure why he's articulated the reasons he
has. Best answer I can give the Court, I like men better than women. I
struck more women than men, period. There were certain women who
I felt I related to better than others. There was some women [defense
counsel] related better to. [Defense counsel], I think [prospective juror
8] liked him. I got the feeling through the questionnaire and listening
to her talk she is someone who would be very outspoken once she took
a position. She would never change her mine. There are several ladies
on the panel we struck for just that reason, as a matter of fact, no. 3, as
[defense counsel] agreed, for the same reason. I think that literally once
she took a position, she would never give in and that's why [defense
counsel] agreed to her. [Prospective juror 8] was the same thing. There
are several women on the panel, just like the nurse who is on it, I struck
white female Protestant. I think once she made up her mind, she
wouldn't change. It's the bow up factor, if they're going to bow up,
they're going to bow up forever. I think that's [prospective juror 8].


 [the court]: I want to make sure it's clear. I did find the defense did
[not] make a proper prima facie case; however, I did ask for that reason
for protection of the record. 


 No further objections were made by the appellant.


 b. Analysis

 Appellant's Batson objection at trial was that the prosecutor was using her
peremptory strikes to remove Jewish people from the jury. However, on appeal, he
complains that the prosecutor was using her peremptory strikes to remove women
from the jury. He never made that complaint at trial. Because his point of error on
appeal does not comport with his objection at trial, his complaints on appeal have
been waived. See Coffey v. State, 796 S.W.2d 175, 179 (Tex. Crim. App. 1990) (trial
court objection must comport with point of error raised on appeal).


 Accordingly, we overrule points of error 47-49.

H. Rule of Optional Completeness

 In point of error 50, appellant contends the trial court erred by refusing to allow
him to question the investigating police officer about statements the defendant made
to the officer. Appellant contends that, because the State was allowed to present a
portion of appellant's statement to police, he should have been allowed to introduce
the remainder of the conversation under Rule 107 of the Texas Rules of Evidence.

 Rule 107 provides:

 When part of an act, declaration, conversation, writing or recorded
statement is given in evidence by one party, the whole on the same
subject may be inquired into by the other, and any other act, declaration,
writing or recorded statement which is necessary to make it fully
understood or to explain the same may also be given in evidence. . . 


Tex. R. Evid. 107.


 1. Facts

 During the direct examination of Officer Sampson, the following exchange
took place:

 [the prosecutor]: Turning your attention now to November 30, 1998,
what did you spend that day doing in regards to this case?


 [Officer Sampson]: During the conversation that I had with [appellant]
at Dunstan, I asked him his activities of the day and he told me he had
been playing football just prior to arriving back at the Dunstan address. 
And during that conversation he gave me-I asked him to give me a list
of the names of the people he was playing football with and as many
telephone numbers that he could remember or knew. (Emphasis added).


 [the prosecutor] Did he give you all the information?


 [Officer Sampson]: As much as he could, yes.

 Thereafter, appellant sought "to elicit everything that [a]ppellant told Officer
Sampson about 'his activities of the day,' but the judge only permitted [a]ppellant to
inquire about playing football." Specifically, the trial court stated:

 My ruling here is that you can get into-specifically into the portion of
the conversation concerning defendant's naming football players and it's
necessary to make that portion fully understood because it doesn't make
it necessary and I will let you go into those portions of the conversation
of the football players at the time that he arrived at the football field. At
the time he arrived and if it makes it clear, I will let it in.


 Appellant contends that, under rule 107, he should have been permitted to get
everything that he told Officer Sampson about his activities of the day into evidence. 
We disagree. 

 Rule 107 is properly invoked when an opposing party reads part, but not all,
of a statement into evidence. See Livingston v. State, 739 S.W.2d 311, 331-32 (Tex.
Crim. App. 1987); Araiza v. State, 929 S.W.2d 552, 555-56 (Tex. App.--San Antonio
1996, pet. ref'd). In such a case, the remainder of the statement "on the same subject"
is admissible to "reduce the possibility of the fact finder receiving a false impression.
. . ." Roman v. State, 503 S.W.2d 252, 253 (Tex. Crim. App. 1974); Araiza, 929
S.W.2d at 556. However, merely referring to a statement or a quotation from it does
not invoke the rule. Jernigan v. State, 589 S.W.2d 681, 694-95 (Tex. Crim. App.
1979); Pinkney v. State, 848 S.W.2d 363, 367 (Tex. App.--Houston [1st Dist.] 1993,
no pet.); Araiza, 929 S.W.2d at 556.

 In this case, Officer Sampson did not offer extensive details about his
conversation with appellant about "[appellant's] actions that day." Rather, Officer
Sampson testified that, because appellant told him that he had been playing football
just before he was detained, Sampson spent the next day interviewing the football
players appellant had named. The trial court, properly, allowed appellant to question
Sampson about the same subject, i.e., Sampson's conversation with appellant
regarding the football game. It did not, however, allow appellant to present his entire
version of the events of the day of the murder. Such evidence would have been self-serving hearsay by appellant and was not necessary to correct a false, or incorrect
impression created by Officer Sampson's testimony. See Jones v. State, 963 S.W.2d
177, 182 (Tex. App.--Fort Worth 1998, pet. ref'd) (stating rule 107 permits self-serving hearsay statements by defendant only when necessary to correct false
impression created by hearing only part of statement).

 Accordingly, we overrule point of error 50.

I. Comment on Appellant's Decision Not to Testify

 In point of error 51, appellant contends the trial court erred by overruling his
objection to the State's closing argument, which, he contends, constituted a comment
on appellant's decision not to testify. The State responds that the comment at issue
was, in actuality, an appropriate response to the argument of the appellant's trial
counsel. The State further argues that the trial court's instruction to the jury to
disregard the comment cured any possible error.

 A. Background

 During the trial, defense counsel repeatedly attempted to offer into evidence
oral and written statements that appellant made to police officers while he was in
custody on November 27, 1998. The State objected to the admission of the
statements each time they were offered, arguing that they were self-serving hearsay. 
During final arguments to the jury at the end of the guilt/innocence stage of trial,
appellant's counsel commented about the State's unwillingness to allow the
statements in evidence. Specifically, the defense argued:

"[Appellant] gets to the police station at 8:20. He, again, is interviewed. He,
again, answers all the questions that they have of him. He, again, gives them
the time line of where he has been that day. Not only does he give them an oral
statement, he gives them a written statement. It's not in evidence, but the State
objected. It's very unusual when a suspect gives a written statement for the
State to object. But it's not in evidence. But we do know that he gave a
written statement, and we do know that the officer set out to check it out. And
if there was anyone in the written statement that was wrong, they would have
brought you evidence: but everything that they checked out, checked out."


 During the prosecutor's final argument to the jury, she made the following
statement, referring to the defense attorney's final argument:[defense counsel] says: The State objects to me trying to get out of
Sampson what the defendant's activities were that day. Then he says- The
State objects to me trying to get in the defendant's written statement, and that's
rare around here that that happens.


You know what? Directly in response to his comment is this: Do you
think that I can cross-examine from Sampson what the defendant told him? 
No. Strategic reasons keep us from letting things in because we're trying to
make the trial end up the way we want it to end up, for strategic reasons. We
didn't want his story coming in without him telling the story.


 Appellant's counsel objected and the trial court sustained the objection. He
then moved for a mistrial, which the trial court denied.

 B. Standard of Review

 Permissible jury argument falls within one of four categories: (1) summation
of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law
enforcement; and (4) response to opposing counsel. Felder v. State, 848 S.W.2d 85,
94-95 (Tex. Crim. App. 1992). If we determine that the argument fell outside these
four categories, we must then determine whether, in light of the record as a whole,
there is a reasonable probability that the improper argument might have contributed
to appellant's conviction or punishment. Orona v. State, 791 S.W.2d 125, 128 (Tex.
Crim. App. 1990). Even if the argument exceeds the bounds of proper jury argument,
reversible error occurs only when, in light of the record as a whole, the argument is
extreme, manifestly improper, violative of a mandatory statute, or injects new facts
harmful to the accused into the trial proceeding. Simpson v. State, 886 S.W.2d 449,
454 (Tex. App.--Houston [1st Dist.] 1994, pet. ref'd). 

 C. Response to Argument by Defense

Appellant argues that the State's argument was an improper comment of his
failure to take the stand, which violated his right against self-incrimination. The State
responds that the comment was a response to the arguments of appellant's counsel,
who repeatedly implied that the State was hiding evidence favorable to appellant by
objecting to the admissibility of appellant's written statement. 

We hold that the prosecutor's comment, "we didn't want his story coming in
without him telling the story" was a response to defense counsel's argument that the
State was hiding evidence by objecting to the admission of appellant's statement. As
such, it was permissible under Long v. State, 823 S.W.2d 259, 269 (Tex. Crim. App.
1991), which holds that, even if it requires the prosecutor to comment on a
defendant's failure to testify, the State may answer jury arguments made by the
defense. Here, the State mentioned the defendant's failure to testify in the context of
responding to defense counsel. There was no way for the prosecutor to explain to the
jury why she had objected to the admission of the written statement without bringing 
attention to defendant's refusal to testify.

 Accordingly, we overrule point of error 51.

 We affirm the judgment.



 Michael H. Schneider

 Chief Justice


Panel consists of Chief Justice Schneider and Justices Taft and Radack.


Do not publish. Tex. R. App. P. 47.
















 
1. 
 

2. 
3. " 
 " ' 
 ' - 
 - 
 ' - 
 '
 
4. "" 
 
 
 
 
 
5. 
 
 
 
 
 
 
 ' 
 
6. 
 
 
 
 
 
 
7. ' 
 
 -
 
 
 
 
 
 " 
 
 ' 
 
 "
8. 
 
 " ' 
" 
" - ' " 
 

9.